Filed 8/6/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MISSIONARY GUADALUPANAS OF THE HOLY SPIRIT INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MICHELLE ROUILLARD, as Director, etc., <br><br> Defendant and Respondent. | C083232 <br><br> (Super. Ct. No. 34201580002226) |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Affirmed.

Greene & Roberts and Stephen J. Greene, Jr., for Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, David Chaney, Chief Assistant Attorney General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Niromi W. Pfeiffer, Deputy Attorney General, Karli Eisenberg, Deputy Attorney General, for Defendant and Respondent.

1

This case presents the narrow issue of whether respondent Michelle Rouillard in her capacity as director of California's Department of Managed Health Care (Department) violated the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.) when she sent letters to seven health care service plans directing them to comply with California law in their coverage of abortion services.[1]  Health care service plans are required by law to cover basic health care services "where medically necessary."  (Health & Saf. Code, §§ 1345, 1367, subd. (i); Cal. Code Regs., tit. 28, § 1300.67.)  The issue tendered here and below is whether a "voluntary" abortion is a "medically necessary" procedure that health care service plans are required to cover.  By setting up a false choice between "voluntary" abortions and "medically necessary" abortions, the petitioner attempts to limit coverage of most abortions by health care service plans in California.

The letters in question informed the seven health care service plans that the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act or Act) (Health & Saf. Code, § 1340 et seq.) requires that they cover basic health care services, and that the California Constitution prohibits health care service plans from discriminating against women who choose to terminate a pregnancy.  The letters told the recipients that health care plans could not limit or exclude coverage for termination of pregnancies.  Petitioner Missionary Guadalupanas of the Holy Spirit, Inc., claims that by sending out the letters interpreting "basic health care services" to include abortions, respondent ignored the APA rulemaking process.  Petitioner's argument sets forth a false dichotomy between a "voluntary" service and a "medically necessary" health care service, which health care plans are required to cover under California Code of Regulations, title 28, section

---

[1]     We shall refer to the respondent as the Department.  This case does not present, nor do we address any claim that the Department's actions in carrying out California law substantially burdened the petitioner's exercise of religion in violation of the federal Religious Freedom Restoration Act of 1993, the issue presented in *Burwell v. Hobby Lobby Stores, Inc.* (2014) 573 U.S. 682.

1300.67.[2]  This false assumption led petitioner to the flawed conclusion that the Department's letters were for the purpose of clarifying an ambiguity in the statute, and that compliance with the rulemaking procedures of the APA was necessary.

Petitioner does not attempt a definition of "medically necessary."  It cannot mean only lifesaving treatment.  Many basic health care services are not lifesaving treatments.  Nor can the term be limited to its definition in Welfare and Institutions Code section 14059.5, addressing Medi-Cal reimbursements.  That law defines medically necessary treatment as "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  Particularly in the case of a woman's reproductive health, basic health care that is medically necessary includes labor and delivery services, even though such services may not be necessary to "protect life, prevent significant illness or significant disability, or to alleviate severe pain."  We need not comprehensively define the term "medically necessary" for purposes of this case.  However, in broad terms a "medically necessary" procedure must include a procedure that is a generally recognized treatment for a medical condition presented by the patient.  While the Department may well be obligated to comply with the APA if it wants to narrow the broad definition, there is no need to comply with the APA in this case because an abortion procedure is both a recognized treatment for the medical condition of a patient's pregnancy, and a treatment every woman in California has the legal right to choose.  (Health & Saf. Code, § 123462.)

Whether an agency has adopted the only legally tenable interpretation of the law such that it is not required to comply with the APA, depends on whether the language of the law in question is ambiguous as applied to the circumstances presented.  If the language is unambiguous, the agency need not comply with the APA.  In this case,

---

[2]    Petitioner defines a voluntary abortion as any abortion other than one performed because the pregnancy puts the mother's life in jeopardy.

3

abortion services are unambiguously included in the statutory categories of "basic health care services" set forth in the statute. (Health & Saf. Code, § 1345.) We also reject petitioner's argument that voluntary abortions are necessarily inconsistent with *regulatory* language that limits the scope of "basic health care services" to "medically necessary" services. (Cal. Code Regs., tit. 28, § 1300.67.) We hold that an abortion is one of two medically necessary options for the treatment of a woman's pregnancy. A pregnant patient may elect medical services necessary to deliver a baby, or to terminate the pregnancy. Because California law guarantees every woman the right to choose whether to bear a child or obtain an abortion, the only legally tenable interpretation of the law is that abortions are basic health care services, which health care service plans are required to cover. Furthermore, the regulation's inclusion of "voluntary family planning services" in the list of "basic health care services" to be covered "where medically necessary" is inconsistent with an interpretation that excludes voluntary abortions from coverage. Accordingly, the application of the regulation to these facts is unambiguous, and the Department was not required to comply with the APA. Finally, we hold the trial court did not abuse its discretion when it denied petitioner's new trial motion.

We shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Department is in charge of executing California's laws relating to health care service plans (Plans) and ensuring that Plans provide access to quality health care services. (Health & Saf. Code, § 1341.)[3] Unless exempt, Plans cannot operate in the state without a license, which is issued by the Department. (§ 1349.)

---

**3** Undesignated statutory references are to the Health and Safety Code.

The Legislature has not seen fit to detail each and every health care service a Plan is required to cover.  Rather, Plans are required by statute to offer "basic health care services."  (§ 1367, subd. (i).)  "Basic health care services" are defined in the statute as:

> "(1) Physician services, including consultation and referral.

> "(2) Hospital inpatient services and ambulatory care services.

> "(3) Diagnostic laboratory and diagnostic and therapeutic radiologic services.

> "(4) Home health services.

> "(5) Preventive health services.

> "(6) Emergency health care services, including ambulance and ambulance transport services and out-of-area coverage. 'Basic health care services' includes ambulance and ambulance transport services provided through the '911' emergency response system.

> "(7) Hospice care pursuant to Section 1368.2."  (§ 1345, subd. (b).)

The Legislature has delegated to the Department the power to promulgate regulations setting forth the minimum scope of the "basic health care services" Plans are required to provide for licensure.  (§ 1367, subd. (i).)  Accordingly, California Code of Regulations, title 28, section 1300.67 sets forth the scope of basic health care services.  A Plan must include the services set forth in the regulation "where medically necessary[,]" a term not found in the legislation itself in connection with the services a Plan must cover.  As is relevant here, the scope of services set forth by regulation includes physician services, inpatient hospital services, outpatient hospital services, diagnostic laboratory services, and preventative services.  (Cal. Code Regs., tit. 28, § 1300.67, subds. (a)-(f).)  The preventative services included in the scope are "a variety of voluntary family planning services" and "prenatal care."  (Cal. Code Regs., tit. 28, § 1300.67, subd. (f)(2) & (3).)

5

In 2014, the Department sent letters to seven Plans stating in pertinent part:

> "It has come to the attention of the [Department] that some [Plan] contracts contain language that may discriminate against women by limiting or excluding coverage for termination of pregnancies. The [Department] has reviewed the relevant legal authorities and has concluded that it erroneously approved or did not object to such discriminatory language in some evidence of coverage (EOC) filings. The [Department] has performed a survey and has discovered that such language is present in EOCs for products covering a very small fraction of California health plan enrollees.

> "The purpose of this letter is to remind plans that the Knox-Keene Health Care Service Plan Act of 1975 (Knox Keene Act) requires the provision of basic health care services and the California Constitution prohibits health plans from discriminating against women who choose to terminate a pregnancy. Thus, all health plans must treat maternity services and legal abortion neutrally.

> "Exclusions and limitations are also incompatible with both the California Reproductive Privacy Act and multiple California judicial decisions that have unambiguously established under the California Constitution that every pregnant woman has the fundamental right to choose to either bear a child or to have a legal abortion. . . . [¶] Regardless of existing EOC language, effective as of the date of this letter, [Plan] must comply with California law with respect to the coverage of legal abortions.

> **"Required Action**

> "1. [Plan] must review all current health plan documents to ensure that they are compliant with the Knox-Keene Act with regard to legal abortion. This includes plan documents previously approved or not objected to by the [Department].

> "In regards to coverage for abortion services, the descriptors cited below are inconsistent with the Knox-Keene Act and the California Constitution. [Plan] must amend current health plan documents to remove discriminatory coverage exclusions and limitations. These limitations or exclusions

6

include, but are not limited to, any exclusion of coverage for 'voluntary' or 'elective' abortions and/or any limitation of coverage to only 'therapeutic' or 'medically necessary' abortions. [Plan] may, consistent with the law, omit any mention of coverage for abortion services in health plan documents, as abortion is a basic health care service.

"2. To demonstrate compliance, health plans are directed to file any revised relevant health plan documents (e.g. EOCs, subscriber documents, etc.) with the Department as an Amendment to the health plan's license within 90 days of the date of this letter. The filing should highlight as well as underline the changes to the text as required by the California Code of Regulations, title 28, § 1300.52(d)." (Fns. omitted.)[4]

One year after the Department sent letters to the seven Plans, petitioner filed a petition for writ of mandate in superior court, alleging the letters constituted an underground regulation because they were sent in violation of the APA. Petitioner objected to the requirement that all Plans cover all legal abortions. The Department admitted that prior to sending the 2014 letters, it had inadvertently approved Plan contracts limiting abortion coverage to medically necessary abortions. For example, one of the Plans approved prior to 2014 stated that it covered: "Medically Necessary Abortion. For example, an abortion is covered if, due to an existing medical condition, the mother's life would be in jeopardy as a direct result of pregnancy."

Petitioner is a Florida non-profit corporation of Catholic women, whose religious order is based in Mexico and maintains its provincial headquarters in California. Petitioner alleged that among the teachings of the Catholic Church is the belief that abortion is " 'gravely contrary to the moral law.' " Petitioner alleged that even materially cooperating in the provision of direct abortion constitutes a grave moral offense.

---

[4]    Letters containing substantially identical language were sent to Aetna, Anthem Blue Cross, Blue Shield of California, GEM Care, Health Net, Kaiser Permanente Healthcare, and United Health Care.

Petitioner's appellate brief clarifies that by forcing its members into a Plan that covers abortions, the Department is forcing them to subsidize abortion for other Plan participants, something petitioner's members find morally, ethically, and religiously unacceptable. In other words, petitioner's objection is not strictly because it is being forced to pay for abortion coverage for its own members. Presumably its members, finding abortion morally, ethically, and religiously unacceptable, would never have an abortion. Instead, petitioner objects to *other* Plan participants being allowed to have abortion coverage that is funded in any amount by the members' premiums.

The Department demurred to the petition and complaint. In denying the petition and complaint, the trial court reasoned that the letters sent by the Department "[represent] the only legally tenable interpretation of the law." The trial court rejected petitioner's argument that the statutes governing Medi-Cal should be used to define "medically necessary." Under that interpretation elective abortions would not be "medically necessary" because they would not be " 'reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain.' " (Welf. & Inst. Code, § 14059.5.) The trial court reasoned that while the Knox-Keene Act does not define the term "medically necessary," the Act gives some guidance in section 1374.33, subdivision (b). That section states that when a health plan has denied coverage for a service based on a finding that the service is not medically necessary, the question of the medical necessity of the disputed service is to be determined by medical professionals based on the specific medical need of the plan member, the scientific and medical evidence on the effectiveness of the service, on expert opinion, and on generally accepted professional standards. Thus, the trial court concluded, the term "medically necessary" is broader for purposes of the Knox-Keene Act than for the Medi-Cal statutes. Furthermore, because a woman's right to choose is a privacy right protected by the California Constitution and by statute in the Reproductive Privacy Act, the only legally tenable interpretation of the law is that all abortion procedures are deemed medically

8

necessary for purposes of determining whether they are basic health care services under the Knox-Keene Act. The trial court acknowledged that the Department had previously approved Plans limiting coverage for "elective" abortions, but concluded the Department had misconstrued the law.

Petitioner moved for a new trial on the ground the Department had made admissions in a related federal case that it had approved Plans with exclusions for abortion services after sending out the 2014 letters. Petitioner claimed it did not find out about the admissions until the day before the trial court issued its ruling. Petitioner argued this was newly discovered evidence that could not with reasonable diligence have been produced at trial pursuant to Code of Civil Procedure section 657. The trial court denied the new trial motion, finding petitioner had failed to show the evidence could not have been discovered and produced with reasonable diligence at the hearing on the merits, and that the evidence would not have been likely to produce a different result. This appeal followed.

DISCUSSION

I

The Administrative Procedure Act

The APA establishes procedures that state agencies must follow when adopting regulations. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 (*Tidewater*).) The procedures include giving the public notice of the proposed action, issuing a complete text of the proposed regulation and a statement of reasons for it, giving interested parties an opportunity to comment, responding to comments, and forwarding the materials on which the agency relied to the Office of Administrative Law for review. (*Ibid*.) The purposes of the APA process are to give notice to persons affected by a regulation and to give them a voice in its creation. (*Id*. at pp. 568-569.) The procedure also ensures that the agency does not adopt rules it alone knows about. (*Kings Rehabilitation Center, Inc. v. Premo* (1999) 69 Cal.App.4th 215, 217.)

9

A regulation is defined by statute as: "[E]very rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.) A regulation has two principal identifying characteristics: (1) it is intended to apply generally, rather than in a specific case; and (2) it must " 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater*, *supra*, 14 Cal.4th at p. 571; Gov. Code, § 11342.600.) A regulation that is adopted without complying with the APA procedures is known as an underground regulation. (*Kings Rehabilitation Center, Inc. v. Premo, supra,* 69 Cal.App.4th at p. 217.) Failure to comply with the APA procedures nullifies the regulation. (*Ibid.*)

However, the APA does not apply to a regulation "that embodies the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).) This exception applies "only in situations where the law 'can reasonably be read only one way' [citation], such that the agency's actions or decisions in applying the law are essentially rote, ministerial, or otherwise patently compelled by, or repetitive of, the statute's plain language." (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 336-337 (*Morning Star*).)

The distinction between a regulation that is an interpretation of a statute subject to the APA and a regulation that is not subject to the APA because it is the only legally tenable interpretation of a statute turns on the notion of ambiguity. An agency's interpretation of a statute is subject to the rulemaking procedures of the APA if the interpretation "is required to resolve an ambiguity in the law to be enforced." (*Capen v. Shewry* (2007) 155 Cal.App.4th 378, 387 (*Capen*).) " ' "An ambiguity arises when language is reasonably susceptible of more than one application to material facts." ' [Citation.] Read one way the application favors the claimant, read the other way it does

10

not.  Under the Supreme Court's view, an interpretation is ambiguous for purposes of the rulemaking procedures of the APA if no one reading of consequence to the action is 'patently compelled . . . .'  (*Morning Star, supra,* 38 Cal.4th at pp. 336-337.)"  (*Ibid.*)  By contrast, where the language is reasonably susceptible of only one interpretation as applied to the facts, it is " ' "the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).)' "  (*Ibid.*)

## II

### The Letters Did Not Resolve an Ambiguity in the Statute

As indicated, the Knox-Keene Act requires that Plans provide subscribers and enrollees "basic health care services," which are broadly defined to include physician services, hospital inpatient services, ambulatory care services, preventive health services, and emergency health services.  (§§ 1345, subd. (b), 1367, subd. (i).)  The letters fit the definition of a regulation with respect to the Knox-Keene Act because they were intended to apply generally to all Plans, and they were adopted by the Department to make specific the statute being enforced.  (*Tidewater, supra*, 14 Cal.4th at p. 571.)  The "basic health care services" in the Act were made specific by the letters directing the inclusion of abortion services.  However, the letters did not resolve any ambiguity in the Act as applied to abortion services, because "basic health care services" are so broadly defined in the statute that they unambiguously include abortion services, since abortions would necessarily be performed as one of the listed services, i.e., physician services, hospital inpatient services, ambulatory care services, preventive health services, or emergency health care services.  (§ 1345, subd. (b).)  Moreover, petitioner does not argue that abortions do not fall under the broadly defined basic health care services set forth in the statute.  Instead, petitioner's argument is directed to the language of the regulation, as discussed in part III of the Discussion, *post*.

Petitioner argues that the word "abortion" does not appear anywhere in the statute. This is immaterial.  The statute also does not specify that basic health care services

include the setting of broken bones. Nevertheless, there is no question that bonesetting is included under "physician services," "hospital inpatient services," "ambulatory care services," or "emergency health care services." The Department is not required to promulgate a regulation for every specific service that falls within the definition of "basic health care services."[5] These services unambiguously fall within the broad categories of basic health care services set forth in the statute.

Because the letters do not resolve an ambiguity in the statute as applied to the coverage of abortions as a basic health care service, the letters were the only legally tenable interpretation of the statute, and the Department was not required to comply with the rulemaking provisions of the APA before sending the letters.

III

The Letters Did Not Resolve an Ambiguity in the Regulation

The purported ambiguity prompting this action was not created by the language of the statute, but by the language of the Department's own regulation. Petitioner sets up a false dichotomy between a voluntary procedure and a medically necessary procedure, then argues an abortion cannot be both "voluntary" and "medically necessary." Petitioner argues the trial court was wrong to conclude that the only legally tenable interpretation of the regulation is that basic health care services include voluntary abortion.

It is not at all clear that an agency's interpretation of its own regulation constitutes a regulation itself. A regulation "interpret[s] . . . the law enforced or administered" by the agency. (Gov. Code, § 11342.600.) It could be argued that "the law enforced or administered" by the agency does not include the agency's own regulations, but only the

---

**5** The Department claims there are currently over 70,000 diagnosable medical conditions, and over 6,000 classified procedures for treatment—a list that changes with each new medical development.

12

governing statute. However, assuming an interpretation of a regulation is also a regulation, we conclude the language of the regulation is not ambiguous as applied in this case.

The Legislature delegated the power to define the scope of the basic health care services that Plans are required to provide, and the Department promulgated a regulation for that purpose. (§ 1367, subd. (i); Cal. Code Regs., tit. 28, § 1300.67.) Because the legislation defining "basic health care services" does not include the language "medically necessary[,]" and this qualification is the language on which petitioner relies, we look to the Department's own regulation for the scope of medically necessary services. Even though the term "medically necessary" might be ambiguous in some applications, it is not ambiguous under the circumstances presented in this case.

California Code of Regulations, title 28, section 1300.67 states that "[t]he basic health care services required to be provided by a [Plan] to its enrollees shall include, where medically necessary, . . . [¶] . . . [¶] (f) Preventive health services . . . , which shall include, under a physician's supervision, . . . [¶] . . . [¶] a variety of voluntary family planning services." Petitioner's mistake is in assuming that an abortion cannot be a medically necessary health care service if the patient chooses to have an abortion even though her life or health would not be in jeopardy as a direct result of the pregnancy. Petitioner attempts to draw a distinction between "voluntary" or "elective" abortions on the one hand, and "therapeutic" or "medically necessary" abortions on the other. As an example of a "voluntary" abortion, petitioner points to health care service plans the Department approved prior to the correcting letters that were sent in 2014. In one case the plan excluded "elective abortions," defined as one where the mother's life is not in jeopardy from the pregnancy due to an existing medical condition. In another plan abortions were covered only if "due to an existing medical condition, the mother's life would be in jeopardy as a direct result of pregnancy." However, nothing in the statute or

13

the regulation limits medically necessary services to those required to save the patient's life, nor can we imagine that is what the Legislature intended.

The correct question is not whether abortion is a medically necessary service, but what service is medically necessary to treat the condition of pregnancy. The answer is that an abortion is one of two possible medically necessary procedures when the patient is pregnant. Under California law every woman has the right to choose whether to bear a child or obtain an abortion, and the state may not interfere with that choice. (§ 123462.) Given the pregnancy of the patient, two treatments may be medically necessary: medical services to facilitate labor and delivery, or medical services to terminate the pregnancy. Both types of service are voluntary in the sense that they are chosen by the patient. Both types of service are medically necessary to treat the condition of pregnancy. Medical services associated with an abortion are no less medically necessary than medical services associated with delivery. The state may not interpret the provision of "basic health care services," which includes "medically necessary" "voluntary family planning services" to allow Plans to refrain from covering elected abortion services, any more than they could refrain from covering birthing services because the patient has elected to give birth rather than terminate the pregnancy. (Cal. Code Regs., tit. 28, § 1300.67.)

" ' "An ambiguity arises when language is reasonably susceptible of more than one application to material facts." ' " (*Capen*, *supra*, 155 Cal.App.4th at p. 387.) The regulation governing the scope of basic health care services is not ambiguous under the circumstances presented here. The regulation cannot mean, as petitioner claims, that voluntary abortions cannot be medically necessary health care services. If that were true, the regulation would not specifically include "voluntary" family planning services in the list of "medically necessary" basic health care services which Plans are required to provide. The word "voluntary" in this context necessarily includes legal abortions that are the only medically feasible way to terminate a pregnancy. The letters sent by the Department were nothing more than a restatement of a properly enacted regulation.

14

There was no violation of the APA because the letters did not resolve a material ambiguity in the regulation, and the letters were the only legally tenable interpretation of the regulation.

The Knox-Keene Act uses the term "medically necessary" in the statute governing the review of denial of coverage for a service. Section 1374.33, subdivision (b) provides that the reviewer "shall determine whether the disputed health care service was medically necessary based on the specific medical needs of the enrollee and any of the following: (1) Peer-reviewed scientific and medical evidence regarding the effectiveness of the disputed service[;] [¶] (2) Nationally recognized professional standards[;] [¶] (3) Expert opinion[;] [¶] (4) Generally accepted standards of medical practice[; and] [¶] (5) Treatments that are likely to provide a benefit to a patient for conditions for which other treatments are not clinically efficacious." As the trial court found: "This language shows that whether a given health care service is 'medically necessary' is, at least in part, a clinical determination based upon the medical needs of the patient." It does not depend on whether the service is "voluntary."

Petitioner also argues that the Department approved of Plans prior to sending out the letters in question, which limited the types of abortions covered to those necessary to protect the life or health of the mother.[6] However, we do not assume that the current interpretation is wrong because the Department previously made an incorrect interpretation. The interpretation of the statute and the regulation is a question that rests with the courts. (*Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310.) The Department's past interpretation was simply incorrect.

---

[6] Department approved Plan language prior to 2014 that covered "Medically Necessary Abortion" and included the explanation, "For example, an abortion is covered if, due to an existing medical condition, the mother's life would be in jeopardy as a direct result of pregnancy."

15

IV

The Department's Interpretation of Its Regulation is Correct

Whether the Department has adopted the sole legally tenable interpretation is a different question from whether its interpretation is legally correct. (*Morning Star, supra*, 38 Cal.4th at p. 336.) The former is a more narrow exception. (*Id*. at p. 340; *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 262.) Even if we were to void the regulation on the ground that the Department's interpretation is not the sole legally tenable interpretation of its regulation, if we nonetheless decide the Department's interpretation is correct, the Department "is mandated to follow the judicial interpretation of a statute, [and] once that occurs there is no interpretive ambiguity for the [Department] to resolve and hence no [contrary] interpretive regulation that it could enact." (*Capen*, *supra*, 155 Cal.App.4th at p. 390.) We may decide the interpretive issue if the court is in as good a position as the Department to interpret the regulation. (*Id*. at pp. 390-391.)

The Department's letters contain the correct statutory construction, and the Department is now bound by the court's opinion. Our conclusion necessarily follows for all the reasons that the letters are the only legally tenable interpretation of the law. The question here does not turn on "the application of administrative expertise in the first instance." (*Morning Star, supra,* 38 Cal.4th at p. 341.) Resolving whether the term "medically necessary" must exclude "voluntary" health care services does not require the Department's particular expertise. Even though the Department's interpretation of its own regulation deserves great weight, the interpretation is ultimately a question of law, and in this instance this court is in as good a position as the Department to interpret the statute and the regulation. (*Id*. at pp. 340-341; *Carmona v. Division of Industrial Safety*, *supra,* 13 Cal.3d at p. 310.)

We therefore hold that the Department's determination that Plans may not refuse to cover legal abortions is the correct interpretation of the law.

V

New Trial Motion

In October 2015, petitioner filed a notice of related case in superior court.  The related case was identified as *Foothill Church v. Rouillard* (E.D.Cal. July 11, 2016, No. 2:15-cv-02165-KJM-EFB) 2016 U.S. Dist. LEXIS 89678, in the United States District Court for the Eastern District of California.  In January 2016, the Department filed a motion to dismiss in the related case.  Included in the motion to dismiss was a footnote stating:  "[I]n response to one Plan's request, [the Department] has allowed the Plan to offer contracts limiting abortion coverage to 'religious employers' as defined in state law. The Department has been in discussions with at least one other Plan concerning a similar request."  The trial court issued its ruling in this case in July 2016.  Petitioner filed a motion for new trial.  The ground for petitioner's new trial motion was newly discovered evidence, specifically the footnote in the motion to dismiss filed by the Department in the related federal case.

The trial court denied petitioner's motion for new trial.  The trial court found that the evidence was not newly discovered for purposes of Code of Civil Procedure section 657 because petitioner had failed to show it could not have discovered the evidence with reasonable diligence prior to the hearing on the merits.  The trial court further found that the evidence was not likely to produce a different result.

A party may base a motion for new trial on "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial."  (Code Civ. Proc., § 657.)  However, new trials for newly discovered evidence are disfavored.  (*In re Estate of Cover* (1922) 188 Cal. 133, 149.)  A party moving for new trial on the basis of newly discovered evidence must show:  (1) the evidence is newly discovered, (2) it could not with reasonable diligence have been discovered and produced earlier, and (3) the evidence is material.  (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161.)  Evidence is material if it is

17

likely to have produced a different result. (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 728.) Whether a reasonable effort was made to discover the evidence, and whether it was material are questions addressed to the sole discretion of the trial court, and will not be disturbed absent a manifest showing of abuse of discretion. (*Id.* at p. 731; *Dankert v. Lamb Finance Co.* (1956) 146 Cal.App.2d 499, 502.)

A party moving for new trial on the basis of newly discovered evidence must show it exercised reasonable diligence in discovering and producing the evidence. (*Hall v. Goodwill Industries of Southern California* (2011) 193 Cal.App.4th 718, 731.) Petitioner failed to show it could not have earlier discovered the evidence with reasonable diligence. Petitioner claimed it first became aware that the Department had allowed one or two contract exemptions when the fact was referenced in the federal district court's July 11, 2016, order dismissing the case. Petitioner then obtained a copy of the motion to dismiss, which had been filed on January 12, 2016. Both the motion to dismiss and the order were matters of court record in a case that had been designated as a related case. Reasonable diligence would have included staying abreast of the record in the related case. (See *Rubin v. De Lao* (1952) 110 Cal.App.2d 345, 347-348 [the defendant failed to show reasonable diligence where he did not search court records to determine whether plaintiff had filed similar claims].)

Furthermore, the evidence was not material because it is not likely it would have produced a different result. The issue in this case is whether the term "medically necessary," as used in the Department's regulation, necessarily excludes abortions from the statutory definition of "basic health care services." Even though we conclude that the letters set forth the only legally tenable interpretation of the law, the law itself authorizes the director of the Department to allow exemptions in certain circumstances. Section 1367, subdivision (i) provides that a Plan must provide all "basic health care services," but "the director may, for good cause, by rule or order exempt a plan contract or any class of plan contracts from that requirement." The Knox-Keene Act also provides that the

18

director of the Department may exempt a "class of persons or plan contracts" from the Act "if the director finds the action to be in the public interest and not detrimental to the protection of subscribers, enrollees, or persons regulated under this chapter, and that the regulation of the persons or plan contracts is not essential to the purposes of [the Knox-Keene Act]." (§ 1343, subd. (b).)

Thus, the director clearly has the authority to exempt plan contracts from the requirements of the Knox-Keene Act. This is an entirely different question from whether abortions are a "basic health care service" under the Act. The trial court did not abuse its considerable discretion by denying the motion for new trial.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


　　　　　　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　　　　　　BLEASE, J.



We concur:



　　　　/s/
RAYE, P. J.



　　　　/s/
HULL, J.



19